**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ROBERT BRADLEY KASSELL and** | § | |
| **MARCY KASSELL,** | § | |
| | § | |
| **v.** | § | **A-12-CA-669 LY** |
| | § | |
| **WILLIAM CLAY CRAFTON, JR.,** | § | |
| **SUNTRUST INVESTMENT SERVICES** | § | |
| **INC., SUNTRUST BANKS INC.** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

Before the Court are all of the following motions:

- Defendant William Clay Crafton, Jr.'s Amended Opposed Motion to Compel Arbitration (Dkt. No. 68)

- Plaintiffs' Response to Defendant  William Clay Crafton, Jr.'s Amended Opposed Motion to Compel Arbitration (Dkt. No. 101)

- Defendant William Clay Crafton, Jr.'s Reply to Plaintiffs' Response to Amended Opposed Motion to Compel Arbitration (Dkt. No. 96)

- Plaintiffs' Sur-Reply in Opposition to Defendants' Motions to Compel Arbitration (Dkt. No. 106)

- SunTrust Bank, and SunTrust Banks, Inc.'s and SunTrust Investment Services, Inc.'s Motion to Compel Arbitration and for Stay (Dkt. No. 71)

- Plaintiffs' Response to the Suntrust Defendants' Motion to Compel Arbitration and for Stay (Dkt. No. 102)

- SunTrust Bank and SunTrust Banks, Inc.'s and SunTrust Investment Services, Inc.'s Reply to the Plaintiffs' Response (Dkt. No. 104)

- Plaintiffs' Surreply in Opposition to Defendants' Motions to Compel Arbitration (Dkt. No. 106)

- SunTrust Investment Services, Inc.'s and SunTrust Banks, Inc.'s Motion for Summary Judgment (Dkt. No. 69)

- Defendants SunTrust Investment Services, Inc.'s and SunTrust Banks, Inc.'s Supplement to Their Motion for Summary Judgment (Dkt. No. 81)

- Plaintiffs' Response to SunTrust Investment Services, Inc.'s and SunTrust Banks, Inc.'s Motion for Summary Judgment (Dkt. No. 103); and

- Defendants SunTrust Investment Services, Inc.'s and SunTrust Banks, Inc.'s Reply (Dkt. No. 105)

The undersigned magistrate judge submits this Report and Recommendation to the United States District Court pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

## I.  Background[1]

Plaintiff Brad Kassell is a former professional football player for the New York Jets. Plaintiffs' Second Amended Complaint at p. 1.  Plaintiff Marcy Kassell is his wife.  *Id.*  In 2006, Kassell's teammate on the Jets referred him and his wife to William Crafton for investment advice. *Id.* at p. 3. Crafton focused his services on managing investments for athletes.  *Id.*  In 2006, Crafton was the president and sole owner of Martin Kelly Capital Management LLC ("MKCM").  Deposition of William Crafton at 17:15-19; Exhibit A to Crafton's Motion to Compel Arbitration. On October

---

[1] The Kassells have sued three SunTrust entities:  SunTrust Investment Services, Inc. SunTrust Banks, Inc. and SunTrust Bank.  Throughout their briefing, the parties give the different entities different names.  In this Report & Recommendation, the Court will use the following names:

| All three entities collectively : | "SunTrust" |
| SunTrust Investment Services, Inc.: | "Services" |
| SunTrust Banks, Inc.: | "Corporate Parent" |
| SunTrust Bank | "Bank" |

6, 2006, the Kassells entered into a Financial Services Agreement with MKCM.  Financial Services Agreement; Exhibit B to Crafton's Motion to Compel Arbitration.  Between late 2006 and 2011, Crafton and the MKCM team invested and maintained approximately $700,000 of the Kassells' money.  Plaintiffs' Second Amended Complaint at p. 4. Beginning in 2007, Crafton and MKCM invested the Kassell's money in Westmoore Investments, LP and its affiliates, which the SEC ultimately sued, contending it was a Ponzi scheme.  *Id.* at pp. 4-7.

In a written notice dated October 26, 2009, Crafton notified the Kassells of the planned acquisition of MKCM by SunTrust Bank and requested the Kassells' consent to the assignment of the Financial Services Agreement to SunTrust Bank, which the Kassells granted.  Exhibit C to Crafton's Motion to Compel Arbitration.  On November 19, 2009, SunTrust Bank acquired MKCM's assets pursuant to an Asset Purchase Agreement. Exhibit D to Crafton's Motion to Compel Arbitration.  Crafton became an employee of SunTrust Bank on December 22, 2009. Deposition of William Crafton at 79:10-14; Exhibit A to Crafton's Motion to Compel Arbitration.

In 2010, Crafton advised that the Kassells take out a $400,000 line of credit with SunTrust Bank, which they did.  *Id.* The credit line was maxed-out for at least one year and accruing interest charges of approximately $1,000 per month.  The Kassells allege that Crafton and his associates advised that they take out the loan so that he could keep more of the Kassells' assets under management and earn commissions and/or fees on them, and that there was no reasonable financial benefit to the Kassells for taking out the loan. *Id.* at pp. 8-9.   The Kassells allege that the three SunTrust Defendants—Bank, Corporate Parent, and Services—are affiliated entities, and that collectively, the entities contracted with them to provide professional services in the form of investment advice and management, and breached that contract when they failed to provide those

3

services in compliance with their legal, ethical, and professional obligations. *Id.* at p. 12. The Kassells also allege claims against SunTrust and Crafton[2] for: breach of fiduciary duty; violations of the Texas Securities Act; common law fraud; statutory fraud; negligence and gross negligence; negligent misrepresentation; conspiracy; and violations of the DTPA. *Id.* at pp. 12-17. The Kassells assert that SunTrust is liable for the actions of Crafton through the theory of agency and/or respondeat superior. *Id.* at pp. 18-19.

## II. Analysis

### A.    Background and Basic Principles

Crafton and the SunTrust Defendants each move the Court to compel arbitration of the Kassells' claims. (Dkt. Nos. 68 and 71). They rely upon the Financial Services Agreement ("MKCM Agreement") signed by the Kassells and MKCM, Crafton's prior firm. Exhibit B to Crafton's Amended Motion to Compel Arbitration. They also rely upon the Select Credit Line Agreement and Disclosure ("LOC"), pursuant to which the Kassells opened a line of credit with Bank in the amount of $400,000.00. Exhibit E to Crafton's Amended Motion to Compel Arbitration.

Paragraph 17 of the Financial Services Agreement states:

> **Arbitration Provision.** It is agreed that any controversy between the Adviser and the Client arising out of Adviser business or this agreement, shall be submitted to arbitration conducted under the provisions of the commercial arbitration rules of the American Arbitration Association. Arbitration must be commenced by service upon the other party of a written demand for arbitration or a written notice of intention to arbitrate, therein electing the arbitration tribunal. In the event the Client does not make such election within (5) days of such demand or notice, then the Client authorizes the Adviser to do so on the Client's behalf. Judgment upon any award

---

[2]The Kassells bring most of these claims against "Defendants" and do not distinguish claims brought against Crafton individually versus those brought against specific SunTrust entities.

> rendered by the arbitrators shall be final and may be entered in any court having jurisdiction thereof.  This clause does not constitute a waiver of any right including the right to choose the forum, whether arbitration or adjudication, in which to seek resolution of disputes.

Exhibit B, Paragraph 17. The Financial Services Agreement between the Kassells and MKCM provided that it could be assigned pursuant to the written consent of the other party, Ex. 1-C to SunTrust Defendants' Motion to Compel Arbitration, and as mentioned earlier, the Kassells consented to the assignment of their agreement.

The LOC contains a seven paragraph Arbitration Clause that requires arbitration of "any claim, dispute, or controversy" between Bank and Bank's employees "arising from or relating to" the line of credit. Exhibit E to Crafton's Amended Motion to Compel Arbitration at p. 4.[3]  The LOC's arbitration provision reads in part:

> READ THIS PROVISION CAREFULLY; IT WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL CLAIMS WE HAVE AGAINST EACH OTHER ARE RESOLVED. For a Claim subject to arbitration, neither you nor we will have the right to: (1) have a court or a jury decide the Claim; (2) engage in information gathering (discovery) to the same extent as in court; (3) participate in a class action in court or in arbitration; or (4) join or consolidate your Claim(s) with claims of any other person. The right to appeal is more limited in arbitration than in court and other rights in court may be unavailable or limited in arbitration.

*Id.* The arbitration agreement covers claims against Bank and its "parents, subsidiaries, and affiliates." *Id.*

Defendants argue that under the Federal Arbitration Act, 9 U.S.C. §§ 1-2, the Kassell's contract with MKCM and the Bank LOC Agreement mandate that the disputes raised in this case be arbitrated.  The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, provides that:

---

[3]The copy of Exhibit E submitted to the Court is illegible, but the parties do not dispute the language contained in the LOC.

> [a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. There is a strong presumption in favor of arbitration under the FAA. *See* 9 U.S.C. § 2; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). As a matter of federal law, arbitration agreements and clauses are to be enforced unless they are invalid under principles of state law that govern all contracts. *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 166 (5th Cir. 2004). Therefore, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 687 (1996). The FAA "provides for . . . orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289, (2002) (citing 9 U.S.C. §§ 3 & 4).

Courts employ a two-step analysis to determine whether a party may be compelled to arbitrate. First, the Court determines whether the party has agreed to arbitrate the dispute. If the party has agreed to arbitrate, the Court then asks whether any federal statute or policy renders the claims nonarbitable. *JP Morgan Chase & Co. v. Conegie*, 492 F.3d 596, 598 (5th Cir. 2007). The Kassells do not contend that either of the agreements in this case were procured through fraud or duress, or are invalid because they are unconscionable or violate public policy. Rather, they contend that the arbitration clause in the MKCM agreement is permissive, not mandatory, and thus that they may not be forced to arbitrate. They also assert that Crafton and SunTrust are not signatories to the MKCM agreement, and thus they are prohibited from seeking to invoke the agreement to force the

Kassells to arbitrate.  And finally, as to the LOC arbitration clause, the Kassells contend that the agreement was terminated when they repaid the loan in full in 2012, and that it has no applicability to this dispute, and further, even if it did apply, this dispute is not within the scope of that clause.

Thus, the Court's determination of the various motions requires consideration of whether a valid agreement to arbitrate exists among the parties and whether the dispute is within the scope of the arbitration agreement.  *See Webb v. Investacorp, Inc.*, 89 F.3d 252, 257–58 (5th Cir. 1996). The strong federal policy favoring arbitration does not apply in the initial determination of whether there is an agreement to arbitrate this dispute. *Klein v. Nabors Drilling USA, L.P.*, 710 F.3d 234, 236 (5th Cir. 2013).  It is in step two of the analysis, determining the scope of a valid arbitration agreement, that the Court applies the federal policy and construes ambiguities in favor of arbitration. *Id.*

## B.    MKCM Agreement - Mandatory or Permissive?

In asserting that the MKCM Agreement is a valid agreement to arbitrate their claims, Defendants rely on the language in the MKCM Agreement that "any controversy" between MKCM and the Kassells, "***shall*** be submitted to arbitration." Ex. B at ¶ 17 (emphasis added).  Defendants argue that the arbitration clause in the MKCM Agreement is an unambiguous mandatory agreement to arbitrate. Defendants assert that in a nearly identical case brought against Crafton and Bank, a federal court compelled arbitration based upon the same arbitration provision found in the MKCM Agreement and the same Consent to Assignment.  *Feeley v. SunTrust Bank, et al*, No. 12-4522, 2013 WL 638881 (E.D. Pa., February 20, 2013).[4]  The Kassells respond that the MKCM Agreement's arbitration clause is permissive and not mandatory and does not require them to arbitrate.  The

---

[4]In *Feeley* neither party apparently contested the compulsory nature of the arbitration agreement, so the case is of limited relevance to this case.

Kassells point out that the last sentence of the clause states "[t]his clause does not constitute a waiver of *any right* including the right to choose the forum, ***whether arbitration or adjudication***, in which to seek resolution of disputes." (Emphasis added). Plaintiffs assert that this clause expressly and unambiguously reserves their right to choose any forum to resolve their dispute—including this forum.

To determine whether an arbitration agreement is valid, courts apply ordinary state-law principles governing the formation of contracts. *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012). In this case, the parties do not dispute that California law governs the MKCM Agreement. Additionally, the parties do not dispute that the Kassells willingly signed the MKCM Agreement and are bound by its terms. Thus the Court is guided by California contract principles to determine whether the Kassells are required to resolve their dispute through arbitration. *See Klein* 710 F.3d at 236. California has a strong public policy in favor of arbitration as an expeditious and cost-effective way of resolving disputes. *Moncharsh v. Heily & Blase*, 3 Cal. 4th 1, 9 (1992). Even so, parties can only be compelled to arbitrate when they have agreed to do so. *Westra v. Marcus & Millichap Real Estate Investment Brokerage Co., Inc.,* 129 Cal. App. 4th 759, 763 (2005). "California law incorporates many of the basic policy objectives contained in the FAA, including a presumption in favor of arbitrability . . . ." *Erickson v. Aetna Health Plans of California*, 71 Cal. App. 4th 646, 656 (1999) (citation omitted). Under California law courts follow "the rule that, contractual arbitration being a favored method of resolving disputes, every intendment will be indulged to give effect to such proceedings." *Id.* (citing *Titan Group, Inc. v. Sonoma Valley Sanitation Dist.*, 164 Cal. App. 3d 1122, 1127 (1985)). Further, when, as here, the FAA applies, California courts apply the principle that "ambiguities in an arbitration clause are to be resolved in

8

favor of arbitration, notwithstanding the California rule that a contract is construed most strongly against the drafter . . . ." *Id.* (citing *Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal. App. 3d 632, 639 (1986)).

Under California law, the general rule of contract interpretation is that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." CAL. CIV. CODE § 1641 (West 2011). This statute's effect, among other things, is to disfavor constructions of contractual provisions that would render other provisions surplusage. *City of El Cajon v. El Cajon Police Officers' Assn.*, 49 Cal. App. 4th 64, 71 (1996). Additionally, under California Civil Code § 1644, "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." CAL. CIV. CODE § 1644 (West 2011).

The Kassells argue that the only way to harmonize the first four sentences of the Arbitration Provision with the last sentence is to read the provision as a whole as permissive and not mandatory. Otherwise, they argue, their right to choose any forum granted in the last sentence would be eviscerated. The Kassells assert that "shall" is not always mandatory, and cite a litany of cases in support. *See* Dkt. No. 101 at p. 4. They additionally urge that the phrase "shall be submitted to arbitration conducted under the rules of the American Arbitration Association" may be interpreted as merely mandating that should the parties elect to proceed to arbitration, they must proceed in accordance with the rules of the American Arbitration Association.

While the Kassells cite to a number of cases addressing the use of "may" and "shall" in contracts, they have pointed to no California case similar to the case before the Court, in which a

court has construed "shall" as permissive in the context of an arbitration clause.  In fact, various California courts have found the use of the word "may" in an arbitration clause to require arbitration. "California decisional law . . . construes the word 'may' as mandatory in arbitration contracts." *Stockton Metropolitan Transit Dist. v. Amalgamated Transit Union*, 132 Cal. App. 3d 203, 214 (1992).  In *Pacific Gas & Electric Co. v. Superior*, 15 Cal. App. 4th 576, 595 (1993), the court concluded that a clause specifying that any dispute "*may* be submitted by either party to arbitration" was best read to require arbitration if either party invoked the clause, reasoning "[i]f that connotation were not employed the arbitration provision would serve little or no purpose, a disfavored result . . . ."  Similarly, a California court held that an agreement providing that "the issue in dispute *may* be submitted to an impartial arbitrator" made arbitration mandatory, concluding that because parties can always elect consensual arbitration without a contract provision, interpretation of the clause to require only consensual arbitration would make the provision of little or no purpose.  *Srvc. Empl.Intern'l Union, Local 18 v. Am. Bldg. Maint. Co.*, 29 Cal. App. 3d 356 (1972).

Moreover, in general, California case law views the word "shall" as mandatory.  *See, e.g., County of Orange v. Bezaire*, 117 Cal. App. 4th 121, 129 (2004) ( "Generally speaking, of course, the word 'may' is permissive—you can do it if you want, but you aren't being forced to—while the word 'shall' is mandatory—no way you can do it. ); *Woodbury v. Brown-Dempsey,* 108 Cal.App.4th 421, 433 (2003) ("Ordinarily, the word 'may' connotes a discretionary or permissive act; the word 'shall' connotes a mandatory or directory duty."); *Decker v. U.D. Registry, Inc.,* 105 Cal.App. 4th 1382, 1389 (2003) (generally speaking, "may" is discretionary, "shall" is mandatory); *Dean v. Kuchel,* 37 Cal.2d 97, 101-102 (1951) (same).  Thus, absent some compelling reason to conclude otherwise, California law will view the use of "shall" in the Arbitration Provision as mandatory.

The Kassells rely on *Titan Group Inc., v. Sonoma County Sanitation*, 211 Cal. Rptr. 62 (Ct. App. 1985), to support their interpretation of the first four sentences of the clause as only setting out procedures in the event the parties agreed to arbitrate, and not mandating arbitration.  But *Titan* is not on point.  There, the contract read:

> Except as may be otherwise provided in this contract, all claims, counterclaims, disputes and other matters in question between the Owner and Contractor arising out of or relating to this agreement or the breach thereof will be decided by arbitration *if the parties hereto mutually agree*, or in a court of competent jurisdiction within the State in which the owner is located.

*Id.* at 63 (emphasis in original).  In addition to this clause, the contract contained a detailed paragraph setting forth how an arbitrator would be selected, how costs would be apportioned, and other process issues.  Throughout that clause, there were many uses of the word "shall."  Notwithstanding this, that clause started with permissive language:

> All questions or controversies which may arise between the Contractor and the Owner under or in reference to this contract, *may* be subject to the decision of some competent person to be agreed upon by the Owner and the Contractor who shall act as referee . . .

*Id.*[5]  The court in *Titan* concluded that the language "if the parties hereto mutually agree" made arbitration permissive.  The Kassells point out that the court viewed the contract as not requiring arbitration even though that effectively rendered both clauses "surplusage," as parties can always agree to arbitrate even in the absence of such language.  They suggest a similar reading of the contract here—the first four sentences are agreements on process *if* arbitration is the chosen forum,

---

[5]The contract was between a public entity and a private contractor for the construction of a wastewater treatment plant.  The two clauses had separate origins—the first was mandated by the EPA, while the second was required by the USDA, through which the public entity obtained financing for the project.  Significantly, the original version of the second clause mandated by the USDA originally contained the word "shall," but the utility district intentionally changed it to "may" when it drafted the contract.

while the last sentence preserves each party's ability to choose to arbitrate or litigate.   The differences between *Titan* and this case are many.  As noted in the footnote, the contract in *Titan* was a mish-mash of federally-required provisions that the court was straining to harmonize, so it is not surprising that the court found itself reaching the result it did, even if that lessened the import of some of the contract's language.   The other alternative—finding the contract as mandating arbitration—was much less palatable given the complete absence of any mandatory language.  And that is the point.  Here, unlike in *Titan*, there is clear, direct language mandating arbitration of disputes.  Nothing in *Titan* suggests that the contract here, with its very different language, permits, rather than mandates, arbitration.

On the other hand, SunTrust has offered a reading of the clause that is consistent with mandatory arbitration.   They point out that the California Arbitration Act specifically allows arbitration and litigation to proceed in tandem. They offer various examples under California law of how this might happen.[6]  With this context, SunTrust contends that the last sentence of the clause addresses the forum for this type of satellite litigation—such as a suit in federal court to affirm an award—which is perfectly consistent with the arbitration itself being mandatory. The Court agrees with this reading.  The best reading of the last sentence of the Arbitration Provision is one which gives it, as well as the rest of the clause, meaning.  This reading is that the final sentence of the

---

[6]Under California procedure, a  party to an arbitration agreement may sue to compel arbitration.  CAL. CODE CIV. PROC. § 1281.2 (West 2007).  In California, a party to an arbitration agreement  may "file  in the court  in the county  in which  an  arbitration  proceeding is pending, or if  an arbitration   proceeding  has not commenced, in any  proper court, an application for a provisional remedy in connection with an arbitrable  controversy,"  including TRO's,  writs of possession, preliminary  injunctions,  and receiverships.  *Id.* at § 1281.8.  Under California law, a court may appoint an arbitrator if the parties cannot agree to one.  *Id.* at § 1281.6.  Under California law, a court may confirm, correct, or vacate an arbitration award.  *Id.* at § 1281.5.

12

clause states  that the parties are unconstrained on the forum in which either party may commence arbitration, seek to have judgment entered on the arbitration award, or bring any other dispute regarding the arbitration.  The contrary reading advocated by the Kassells renders the first four sentences of the Arbitration Provision meaningless.

The Kassells' reliance on *Doran v. Bondy*, 2005 WL 1907252 (W.D. Mich. 2005), does not compel a contrary result.  In that unpublished case, a federal district court in Michigan was faced with a clause with several similarities to the arbitration clause here. It was a two sentence provision, the first sentence providing that the parties agreed that any dispute regarding their agreement "will be settled by arbitration," and the second sentence stating "[h]owever, this provision shall not constitute a waiver of any right provided under any federal securities or state laws, including the right to choose the forum, whether arbitration or adjudication, in which to seek resolution of any controversy or claim."  *Id*. at *8.  The district judge found that the clause was "hopelessly ambiguous," and noted that neither party had "offered an interpretation which gives effect to both sentences of the arbitration clause."  *Id*. He thus concluded that more evidence was needed before he could determine if the parties intended to mandate arbitration.  There are important distinctions between *Doran* and this case.  First, the arbitration-related language of our clause is strongerm and even more directory, than the clause in *Doran*.  Second, unlike in *Doran* where no party offered an interpretation that gave effect to both sentences of the clause, SunTrust's proposed interpretation of this clause renders all five sentences of the clause meaningful, and that interpretation has support in California law, which permits some litigation to coexist alongside arbitration.  Third, *Doran* was not decided under California law, and California law provides that "ambiguities in an arbitration clause

are to be resolved in favor of arbitration." *Erickson* 71 Cal. App. 4th at 656. And finally, of course, the decision in *Doran* has no binding authority on this court.

In the end, while the Court notes that the last sentence of the arbitration clause in the parties' agreement is in tension with the prior four sentences, the Court concludes that the best interpretation of the clause is that, notwithstanding the last sentence, it requires the parties to arbitrate disputes within the scope of the clause.

## C.    Who Can Invoke the MKCM Agreement?

The Kassells  point out the the MKCM Agreement provides for arbitration between the Kassells and "Adviser" [sic] – and the only "Adviser" in the Agreement is Martin Kelly. Because Crafton and the other SunTrust Defendants are not signatories to the Agreement, the Kassells argue Crafton and SunTrust have no right to compel arbitration pursuant to it. The Kassells further contend that the Defendants are not third party beneficiaries to the Agreement, and that if they claim to be it is their burden to prove that status, and they have failed to carry that burden.

Because arbitration is a matter of contract, generally "one must be a party to an arbitration agreement to be bound by it or invoke it." *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.,* (2010) 186 Cal. App. 4th 696, 705 (2010); *Matthau v. Superior Court*, 151 Cal. App. 4th 593, 598 (2007) ("right to arbitration depends on a contract and a party can be compelled to submit a dispute to arbitration only if the party has agreed in writing to do so"). However, both California and federal courts have recognized limited exceptions to this rule, allowing nonsignatories to an agreement containing an arbitration clause to compel arbitration of, or be compelled to arbitrate, a dispute arising within the scope of that agreement. *Suh v. Superior Court*, 181 Cal. App. 4th 1504, 1513 (2010) (describing "six theories by which a nonsignatory may compel or be bound to arbitrate:

14

(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary"); *Boucher v. Alliance Title Company, Inc.,* 127 Cal.App.4th 262, 268 (2005) (same, citing federal cases)).

### 1.     *Crafton*

Crafton asserts that as an agent of MKCM and Bank, sued in those capacities, he can enforce the Arbitration Provision of the MKCM Agreement.[7]  The law is clear that a nonsignatory agent can enforce a principal's arbitration agreement against a signatory, on agency and contract principals. *See, e.g., Letizia v. Prudential Bache Sec., Inc.*, 802 F.2d 1185, 1187-88 (9th Cir. 1986) (arbitration clause applies to customer's claims against nonsignatory broker because signatory brokerage firm acts through its broker).[8]  The Kassells argue that a non-party who is seeking to compel arbitration must prove that he is an intended beneficiary under the contract. *City of Hope v. Cave*, 102 Cal. App. 4th 1356, 1368 (Cal. Ct. App. 2002).  They assert that Crafton fails to identify any California case law supporting his claim that his status as an agent of the signatory is sufficient. Plaintiffs' Response (Dkt. No. 101) at 4.  In reply, Crafton contends that his status as an agent of the signatory is

---

[7]Crafton's arguments regarding agency also apply to the LOC. For the reasons the Court finds that Crafton can compel arbitration under the MKCM Agreement, the Court also finds that, as an agent of Bank, he can compel arbitration under the LOC.

[8]*See also, Dunmire v. Schneider*, 481 F.3d 465, 467 (7th Cir. 2007) ("[t]o the extent that there is any doubt about this,  courts regularly treat employees as third-party beneficiaries of arbitration clauses such as this"); *Pritzker v.  Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110, 1121-22 (3rd Cir.  1993) (signatories must arbitrate claims against nonsignatory stockbroker of brokerage firm); *Trott v. Paciolla*, 748 F.Supp. 305, 309 (E.D. Pa. 1990) ("Merrill Lynch can only act through its employees and an arbitration agreement would be of little practical value if it did not extend to employees."); *Scher v. Bear Stearns & Co., Inc.*, 723 F.Supp. 211, 216-17 (S.D.N.Y. 1989) ("weight of  the precedents"  is "overwhelming" that  plaintiffs cannot evade  arbitration agreement with brokerage firm by suing broker individually).

sufficient to permit him to enforce the arbitration provision, and he does not have to prove third party beneficiary status.

California law supports Crafton's position. In *Thomas v. Westlake,* 204 Cal. App. 4th 605, 614-15 (2012) the court stated that "a plaintiff's allegations of an agency relationship among defendants is sufficient to allow the alleged agents to invoke the benefit of an arbitration agreement executed by their principal even though the agents are not parties to the agreement." Under California law, the exceptions to the general rule that one must be a party to an arbitration agreement to invoke it or be bound by it "generally are based on the existence of a relationship between the nonsignatory and the signatory, such as principal and agent or employer and employee, where a sufficient 'identity of interest' exists between them." *Jones v. Jacobson*, 195 Cal. App. 4th 1 at 18 n.9 (2011); *Westra v. Marcus & Millichap Real Estate Inv. Brokerage Co., Inc.,* 129 Cal. App. 4th 759, 766 (2005) (" the existence of an agency or similar relationship between the nonsignatory and one of the parties to the arbitration agreement" is sufficient to permit nonsignatory to invoke agreement); *Dryer v. Los Angeles Rams,* (1985) 40 Cal. 3d 406, 418 (1985) (agents of corporate defendant, a signatory to arbitration agreement, could invoke the arbitration clause as to claims arising out of arbitration agreement, even though they were not signatories to contract).

In Plaintiffs' Second Amended Complaint, the Kassells alleged that Crafton "under the supervision and control of employers and principals, invested and maintained the Kassells' money in high-risk asset classes completely unsuitable for persons with the Kassells' income and assets." Second Amended Complaint (Dkt. No. 17) at p. 4. In various other places in that complaint, the Kassells allege that Crafton worked as an agent for the SunTrust Defendants. *Id.* at 1, 18-19. No one disputes that Crafton, along with others, had formed Martin Kelly Capital Management, and was

16

subsequently an employee of Bank.  As an agent of Bank and of Martin Kelly, Crafton  can take advantage of the Arbitration Provision of the MKCM Agreement under California law.[9]

2.    **SunTrust Defendants**

The SunTrust Defendants rely on a theory of equitable estoppel for their argument that they may compel the Kassells to arbitrate the claims they have brought in this case.  SunTrust contends that a nonsigatory to an arbitration provision can compel a signatory to arbitrate on equitable estoppel grounds: (1) when the signatory's claims against a nonsignatory refer to or presume the existence of the written agreement, the claims arise out of and relate directly to the agreement and arbitration is appropriate, or (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and one or more signatories.  SunTrust asserts that both grounds apply here and relies upon *Grigson v. Creative Artists Agency LLC*, 210 F.3d 524, 527 (5th Cir. 2000), in support of these contentions.

The Kassells contend that state law governs whether nonsignatories can be bound by or benefit from an arbitration agreement.  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631  (2009) (holding that state law governs whether an arbitration clause is enforceable against a nonsignatory under the FAA).  The Kassels argue that the *Grigson* estoppel doctrine upon which the Defendants rely is no longer viable because it is federal common law developed solely to apply to arbitration agreements and has been abrogated. They maintain that the Eleventh Circuit has recognized that *Arthur Anderson* effectively overruled the federal common law that has developed on the issue of

---

[9]A non-signatory to an arbitration agreement can enforce it under California law when it is validly assigned. *Prograph Int'l Inc. v. Barhydt*, 928 F.Supp. 983, 991 (N.D. Cal. 1996).  The parties do not dispute that MKCM assigned the agreement with the Kassells to Bank and that the Kassells consented to this assignment.

estoppel as applied to arbitration agreements. *Lawson v. Life of the South Ins. Co.*, 648 F.3d 1166, 1167 (11th Cir. 2011).[10]   The Kassells point out that Defendants make no argument pursuant to California estoppel doctrines. *See Todd v. S.S. Mut. Underwriting Ass'n (Berm.Ltd.)*, 601 F.3d 329, 333–34 (5th Cir. 2010).

SunTrust asserts that *Grigson*, which holds that a nonsignatory can compel arbitration on estoppel grounds, is still the law.  Additionally, they maintain that it does not matter if *Grigson* is still the law, because both California and federal courts apply equitable estoppel principles  to allow nonsignatories to an agreement containing an arbitration clause to compel arbitration of a dispute arising within the scope of that agreement. *DMS Servs., Inc. v. Superior Ct.*, 205 Cal App. 4th 1346 (2012) (stating "[i]n any event, for purposes of equitable estoppel, California and federal law are identical.") (citations omitted).  SunTrust is correct that under California law a court may rely on the doctrine of equitable estoppel in the arbitration context.   Under this doctrine, a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claim when the causes of action against the nonsignatory are "'intimately founded in and intertwined with' the underlying contract obligations.' " *Molecular Analytical*,  186 Cal. App. 4th at 705 (*citing Boucher*, 127 Cal. App. 4th at 268).  *See also Goldman v. KPMG, LLP,* 173 Cal. App. 4th 209, 220 (2009). The reason for this equitable rule is that one should not be permitted to rely on an agreement containing an arbitration clause for his claims, while at the same time repudiating the arbitration provision contained in the same contract. *Jones v. Jacobson*, 195 Cal. App. 4th at 20 (purpose of

---

[10]*But see Escobal v. Celebration Cruise Operator, Inc.*, 482 F. App'x 475, 476 (11th Cir. 2012) (finding that, although only the plaintiff and the defendant cruise operator were signatories to the arbitration agreement, a non-signatory defendant cruise line was capable of compelling arbitration because the plaintiff's claim against the cruise line was "inextricably intertwined" with the plaintiff's claims against the signatory cruise operator).

equitable estoppel doctrine is to "prevent a party from using the terms or obligations of an agreement as the basis for his [or her] claims against a nonsignatory, while at the same time refusing to arbitrate with the nonsignatory under another clause of that same agreement"); *Boucher*, 127 Cal. App. 4th at 272 ("a party may not make use of a contract containing an arbitration clause and then attempt to avoid the duty to arbitrate by defining the forum in which the dispute will be resolved"); *Molecular Analytical*, 186 Cal. App. 4th at 706 ("[t]he rule applies to prevent parties from trifling with their contractual obligations").

In this case, the Kassells have alleged all claims against "SunTrust" generally, conflating its claims against Bank, Corporate Parent, and Services, and treating the three entities as one entity acting in concert.  In their Second Amended Complaint, the Kassells sue SunTrust for breach of contract, alleging that

> SunTrust contracted with the Kassells to provide professional services in the form of investment advice and management, in accordance with their legal, ethical, and professional duties and obligations, and with the objective of assisting the Kassells in maintaining their assets and increasing their wealth. . . . SunTrust breached the contract because they failed to provide services in compliance with their legal, ethical, and professional obligations. . . .

Plaintiffs' Second Amended Complaint at p. 12. The Court has already concluded that the very same agreement contains a mandatory arbitration provision.  The Kassells are relying upon that agreement as a basis for their breach of contract claim against the SunTrust defendants.  Under the theory of equitable estoppel, because they are suing under the agreement, the Kassells are estopped from denying the applicability of the arbitration provision found therein.

**D.     The Bank LOC Agreement**[11]

The Bank LOC agreement requires arbitration of "any claim, dispute or controversy between [the Kassells] and [SunTrust],[12] other than any Excluded Claim or Proceeding, arising from or relating in any way to the Credit." Ex. E to Crafton's Motion to Compel Arbitration at 4. The SunTrust Defendants assert that the Kassells' claims against SunTrust and Crafton arise out of the investments Crafton advised them to make—including the $400,000.00 loan documented by the LOC, that these claims are not Excluded Claims, and that the arbitration agreement covers claims against Bank and its affiliates. Accordingly, the SunTrust Defendants argue that the LOC compels the Kassells to arbitrate their claims.

The Kassells argue that any obligations they had pursuant to the Credit Line Agreement, including the obligation to arbitrate disputes, ceased upon its termination on January 27, 2012, a date occurring after the Kassells had already repaid the note in full. The LOC Agreement states:

> The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until January 27, 2012 ("Maturity Date"). . . . Despite termination, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement. . . . Despite cancellation, termination or suspension, your obligation under this Agreement will

---

[11]The Kassells assert that neither Crafton nor the SunTrust Defendants have presented evidence that the $400,000 credit line extended to the Kassells was extended pursuant to this particular Credit Line Agreement. They point out that the account numbers on the Kassells' Select Credit Line statements do not match up with the Credit Line Agreement presented by SunTrust with its motion,  SunTrust responds that the account number does not actually matter as the shaded portion of the LOC, which contains the account number, reads "references in the shaded area are for [SunTrust]'s use only and do not limit the applicability of this document to any particular loan or item." The Kassells do not dispute the dates of agreement or that their signatures can be found on the LOC. The Court therefore rejects the Kassells' argument that the LOC is not applicable here.

[12]The arbitration agreement explicitly covers claims against Bank and its "parents, subsidiaries, and affiliates."

remain in full force and effect until you have paid us all amounts due under this Agreement (except for our obligation to make Advances).

Exhibit 7. The Kassells note that Item 7 on page 4 of the Credit Line Agreement lists seven specific events which the Arbitration Provision of the LOC would survive, one of which is "your full repayment of the Credit." However, the Kassells argue, neither "termination," "expiration of the term," nor "Maturity Date" is among the seven specific events for which the Arbitration Provision survives. The Kassells maintain that the maturity date has passed and the agreement has terminated and expired. They maintain that pursuant to Georgia law—the law governing the credit line[13]—any ambiguity in the contract must be construed against the drafter, SunTrust.

SunTrust disagrees that the arbitration provision of the LOC terminated on January 27, 2012. They argue that "term" as used above refers to the term of the Credit Line and not of the arbitration provisions of the agreement. The Court agrees. The LOC specifically states that the arbitration provision survives "your full repayment of the Credit." "Term" as relied upon by the Kassells refers specifically to the term of the Credit Line, which is defined by the beginning and ending date of the Credit Line. Nothing in the language of these provisions is ambiguous, so the construction rule construing ambiguities against the drafter does not come into play in this analysis. The Court therefore concludes that the arbitration agreement contained within the LOC did not terminate on January 27, 2012, and survived the repayment of the loan.

The Kassells next contend that their claims fall outside the scope of the arbitration clause of the LOC. As noted earlier, on questions of scope, the strong federal policy favoring arbitration applies, and questions on this issue are construed in favor of arbitration. *Klein*, 710 F.3d at 236. The

---

[13]The LOC expressly states that Georgia law applies to the extent that federal law is not applicable. Ex. D to SunTrust's Motion to Compel Arbitration, p.4.

LOC states that "'Credit' means the loan or other credit extension you are receiving under this agreement or note and any prior loan or credit extensions you have received from us." Ex. D to SunTrust's Motion to Compel Arbitration at 4. The Kassells contend that their claims "do not fall within the ambit of the arbitration provisions." Plaintiffs' Response (Dkt. No. 101) at 8. They argue that this case is about fraudulent investment advice and it is not about the Credit Line. They state "[t]he $400,000.00 credit line is a merely incidental fact regarding where some of the money came from and does not bear a significant relationship to Plaintiffs' claims." *Id.* at p. 9. Bank argues that the LOC compels arbitration of all claims against Bank and its related entities, and that this includes the Kassells' claims about Defendant Crafton's investment advice.

The Court concludes that the Kassells' claims against Bank arise out of the investments Crafton advised them to make, including the allegedly ill-advised $400,000 borrowing scheme evidenced by the LOC. The LOC's arbitration provision covers "any claim, dispute or controversy between [the plaintiffs] and [SunTrust], other than any Excluded Claim or Proceeding, arising from *or relating in any other way* to the Credit." (Emphasis added.) The Kassells' claims are not among the types of claims or proceedings excluded from arbitration. The provision applies to all of Bank's subsidiaries and affiliates, so the Kassells' claims against Corporate Parent and Services are also covered by the provision. The Kassells' claims against SunTrust do in fact "relate in any way" to the LOC, as the Kassells claim that entering into the LOC was part of the bad investment advice they received from Crafton and the SunTrust entities. The Court finds that the Kassells claims against all Defendants are within the scope of the LOC's Arbitration Agreement.

22

**E.     Have Defendants Waived the Right to Arbitrate?**

The Kassells argue that Corporate Parent and Services have waived any right to arbitrate by seeking a decision on the merits of the Kassells' claims against them before the Court ruled on their motion to compel arbitration.  The Kassells rely upon *In re Mirant Corp.*, 613 F.3d 584, 589 (5th Cir. 2010), in support of their claim of waiver.[14]  In *Mirant*, the Fifth Circuit panel found that a defendant had waived arbitration when it moved to compel arbitration only after the district court had partially denied its third motion to dismiss, despite being fully aware of its right to compel arbitration from the outset.  Corporate Parent and Services respond that in their answer they specifically referenced their right to compel arbitration, and they moved to compel arbitration as an alternative to their motion for summary judgment.

---

[14]The Kassells assert that the issue of whether a party waived its right to arbitrate is a state law issue, relying on *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009).  In *Arthur Andersen*, the Supreme Court held that state law "is applicable to determine which contracts" are binding and enforceable, under the Federal Arbitration Act, " if that [state] law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."  *Arthur Andersen*, 556 U.S. at 630–31.  Thus, *Arthur Andersen* does not state categorically that courts must always apply state law, rather than federal common law, in a waiver situation.  Rather, it states only that courts should apply state law if that law "arose to govern [certain] issues." *Id.*  For instance, the Fifth Circuit has declined to clarify, post-*Arthur Andersen*, whether the "principles of contract and agency law" that "may be called upon to bind a nonsignatory" to an arbitration agreement are to be drawn from state law or from the "federal substantive law of arbitrability." *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 314 (5th Cir.2011) (citations omitted). Because "both bodies of law lead to the same conclusion" the court declined to decide whether state or federal law applied.  *Id.*

Similarly, in this case, federal common law, California law, and Georgia law all lead this Court to the same conclusion regarding the waiver issue, as all three apply essentially the same standard.  *See St. Agnes Medical Center v. PacifiCare of California* 31 Cal. App. 4th 1187, 1195-96 (2003) (relying on federal law—*Peterson v. Shearson/American Exp., Inc.*, 849 F.2d 464, 467–468 (10th Cir. 1988)—to identify factors relevant to determining waiver); *and USA Payday Cash Advance Center # 1 v. Evans*, 281 Ga.App. 847, 848, 637 S.E.2d 418 (2006); *Ed Voyles Jeep-Chrysler v. Wahls*, 294 Ga. App. 876, 877–878, 670 S.E.2d 540 (2008) (holding that Georgia courts look to federal case law to determine whether a party to an arbitration agreement waived its right to compel arbitration.)

There is a strong policy in favor of arbitration under the FAA.  *See Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990).  Courts within the Fifth Circuit "indulge a presumption against finding waiver. A party asserting waiver thus bears a heavy burden of proof in its quest to show that an opponent has waived a contractual right to arbitrate." *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24-25 (1983).  A party waives its right to arbitration when, among other things, it invokes the judicial machinery to "the detriment or prejudice of the other party." *Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 344 (5th Cir. 2004). "[T]he party must, at the very least, engage in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration." *Id.* (quoting *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 329 (5th Cir. 1999)).  Invocation of the judicial process alone is not enough to waive the right to arbitrate. The litigation conduct of the party asserting the right to arbitrate must have prejudiced the opposing party. *See Republic Ins. Co.*, 383 F.3d at 346. "[P]rejudice . . . refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 327 (5th Cir. 1999).

Corporate Parent and Services have not sufficiently invoked the judicial process to waive their right to arbitrate.  Corporate Parent and Services invoked the arbitration clauses early in this case, contending first that they were the wrong SunTrust entities for the Kassells' claims, and alternatively that, even if they were the correct parties, the Kassells were required to arbitrate their

24

claims. Further, the Kassells initially filed suit in this case despite the existence of the two arbitration provisions. Throughout the federal court action, SunTrust has maintained that Bank, and only Bank, is the proper defendant in this case because Bank was Crafton's employer and the LOC was obtained from Bank. Any participation in discovery has been in support of these arguments and not on the merits of the case,

The Fifth Circuit's decision in *Keytrade USA, Inc. v. Ain Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005) is on point here. There, the court found no waiver where a defendant concurrently filed a motion to compel arbitration with a motion for summary judgment and then appealed the denial of the motion to compel arbitration. *Id.* at 897–98**.** The Fifth Circuit concluded that the movant's participation in discovery along with its filing of a motion for summary judgment was not a sufficient invocation of the judicial process to waive the right to arbitrate. The Court observed that the plaintiff had offered "no legal authority for why a motion for summary judgment, filed from a defensive posture, can be characterized as an invocation of judicial process." *Id.* Many other Fifth Circuit cases similarly state that actions taken from a defensive standpoint do not constitute waiver of the right to compel arbitration.[15]

---

[15] *See Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 485 (5th Cir. 2002); *Steel Warehouse Co. v. Abalone Shipping Ltd. of Nicosai*, 141 F.3d 234, 236–38 (5th Cir.1998) (finding no waiver where defendant filed motion to dismiss contemporaneously with a motion to compel arbitration and appealed the denial of the motion to compel arbitration); *Cf., Price v. Drexel Burnham Lambert, Inc.*, 791 F.2d 1156, 1159–62 (5th Cir. 1986) (concluding that the defendant waived its right to arbitrate based on, inter alia, the filing of a motion to dismiss and a motion for summary judgment); *Unity Communs. Corp. v. Cingular Wireless*, 256 Fed. Appx. 679, 681 (5th Cir. Dec. 3, 2007) (affirming district court's conclusion that waiver had occurred based on the movant's filing of motions to dismiss, for summary judgment, and to extend a deadline, participation in discovery, and the taking of an interlocutory appeal); *E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 551 F.2d 1026, 1040–41 (5th Cir. 1977) (finding participation in discovery, presentation of cross-claims, and filing various motions, including a motion to dismiss, waived the right to arbitrate).

This case is much more similar to *KeyTrade* than to *Mirant*. In this case, Services and Corporate Parent participated in limited discovery, focused on the propriety of naming them as defendants, and on arbitration. These two parties participated in the litigation by filing one motion for summary judgment asserting that they should never have been sued, while simultaneously making the alternative argument that the case should be sent to arbitration. Moreover, any prejudice to the Kassells has been de minimus considering the scope of the litigation and the fact that identifying the proper SunTrust entity to sue is necessary whether the case proceeds here or before an arbitrator. Considering the procedural background of this case and the strong presumption against a finding of waiver, the Court concludes that Corporate Parent and Services did not waive their right to seek arbitration by filing their motion for summary judgment.

In summary, the Court finds that under the arbitration provisions of both the MKCM Agreement and the LOC, the Kassells agreed to arbitrate disputes with SunTrust and Crafton. The Court further finds that the Kassells' claims against Crafton and the SunTrust Defendants are within the scope of these two agreements.

### III.   Recommendation

The Court RECOMMENDS that the district judge GRANT Defendant William Clay Crafton, Jr.'s Amended Opposed Motion to Compel Arbitration (Dkt. No. 68) and GRANT  SunTrust Bank, and SunTrust Banks, Inc.'s and SunTrust Investment Services, Inc.'s Motion to Compel Arbitration and for Stay (Dkt. No. 71) and COMPEL all parties to ARBITRATE their claims. The Court FURTHER RECOMMENDS that  Defendants SunTrust Investment Services, Inc.'s and SunTrust Banks, Inc.'s Motion for Summary Judgment (Dkt. No. 69) be DENIED AS MOOT.

### IV.  Warnings

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 18th day of December, 2013.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE